UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSE SERPA VELASQUEZ          )
                             )
            Plaintiff,        )
                             )        Civil Action NO.
        v.                    )        10-10765-DPW
                             )
MICHAEL J. ASTRUE             )
                             )
            Defendant.        )
                             )

MEMORANDUM AND ORDER
August 18, 2011

Plaintiff Jose Serpa Velasquez ("Plaintiff") appeals the
final decision of the Commissioner of Social Security (the
"Commissioner") denying his claim for Social Security Disability
Insurance ("SSDI") and Supplemental Security Income ("SSI").
Because I find that the Commissioner's denial is supported by
substantial evidence, I affirm the decision.

I. BACKGROUND

**A. Medical History**

1. Mental Impairments

Plaintiff has a history of substance abuse and mental health
issues. *See generally* Progress Notes, Dept. Veterans Affs., Exs.
F1-F3, A.R. 289-556. As part of his treatment for alcohol abuse
provided by the Department of Veterans Affairs ("VA") from 2003-
2005, Plaintiff underwent periodic psychiatric evaluations. *Id.*
At his first psychiatric evaluation after leaving the military,
Plaintiff reported anxiety, depression and alcohol abuse.

Psychiatry Admission Evaluation Note, Ex. F3, A.R. 482 (June 18, 2003), and he complained of depression periodically throughout his treatment. *See* Psychiatric Progress Notes, A.R. 338-39 (Jan. 3, 2005), A.R. 365 (Aug. 20, 2004), A.R. 392 (Mar. 25, 2004) A.R. 475 (June 23, 2003). However, certain mental health evaluations noted that Plaintiff did not feel depressed or anxious and that he was "alert, coherent, spontaneous, cooperative and in no acute distress." *See, e.g.*, Psychiatric Progress Note, A.R. 374 (July 30, 2004). Plaintiff was discharged from the VA's substance abuse program on June 6, 2005. SATP Counseling Note, A.R. 302.

Between 2007 and 2009, three mental health professionals preformed consultative examinations of Plaintiff and a fourth provided treatment. First, on December 28, 2007, psychologist Robert Heskett conducted a psychodiagnostic interview of Plaintiff. Ex. 10F, A.R. 571-75. In his report, Dr. Heskett noted that Plaintiff worked 15-25 hours per week as a janitor and that he reported only being able to work alone in positions which involve little stress. A.R. 571. Dr. Heskett took a history and observed that Plaintiff's "facial expression suggestion depression," he had slow, monotonic speech, and he "presented psychotic thinking," including hearing people calling his name and being able to talk with friends who had died. A.R. 574. Dr. Heskett diagnosed Plaintiff with chronic post-traumatic stress disorder; a major depressive disorder, severe with psychotic

features; a panic disorder with agoraphobia; and an adjustment disorder. A.R. 574. He assigned a Global Assessment of Functioning ("GAF") score of 45 to Plaintiff.[1]

The second examination was performed by Dr. Sheree Estes on July 19, 2008. Ex. 22F, A.R. 631-35. At the time, Plaintiff was working 15-20 hours per week and reported that he had no auditory or visual hallucinations. A.R. 632-33. Dr. Estes found that he had "some difficulties with attention, concentration and memory" and "there are some levels of internal distraction, although he performed reasonably well on Mini-Mental Status Examination." A.R. 634. Dr. Estes diagnosed Plaintiff with "major depressive disorder" and noted that he had "some slight PTSD issues related to" his military services in Iraq. *Id.* She assigned a GAF score of 55. A.R. 635.

---

[1] The GAF scale "consider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health—illness" expressed by a number 1-100. AM. PSYCHIATRIC ASS'N, DIAGNOSTICS & STATISTICAL MANUAL OF MENTAL DISORDERS: DS-IV-TR 34 (4th ed. text revision 2000). On the GAF scale 100 denotes superior functioning and no symptoms, and 1 denotes an individual posing a persistent danger of hurting one's self or others, suicidal potential, or a persistent inability to take care of one's self. The scores relevant to Plaintiff's medical history range from 45 to 65. A score of 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A score in the range of 51-60 denotes "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," and a score in the range of 61-70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

In June 2009, Plaintiff began treatment with Dr. Guillermo Gonzalez. Psychiatric Evaluation Report, Ex. 34F, A.R. 694-97, (June 3, 2009). In his initial assessment, Dr. Gonzalez gave Plaintiff a GAF score of 50 and noted marked restrictions in his activities of daily living and marked difficulties in maintaining social functioning. A.R. 694-97. The record includes Dr. Gonzalez's notes from six sessions with Plaintiff between June and October of 2009. A.R. 689-697. In each session after the initial assessment, Dr. Gonzalez noted that Plaintiff had only moderate restrictions on daily activities and moderate difficulty in maintaining social functioning. A.R. 689-93. In the second session, Dr. Gonzalez assigned a GAF score of 50; in the third and fourth sessions he assigned a score of 60; and on the last session, he assigned a score of 65.[2] A.R. 689-693.

On July 31, 2009, Plaintiff was evaluated by Dr. Barbara Stelle for the purposes of assisting in the determination of disability. Consultative Examination Report, Ex. 34F, A.R. 678-80. Dr. Stelle concluded that "[t]he patient would appear to be a poor occupational candidate at present" and diagnosed him with chronic post-traumatic stress disorder; major depressive disorder, recurrent with severe psychotic features; panic disorder with agoraphobia; and adjustment disorder with mixed

---

[2] Dr. Gonzalez did not assign a GAF score on Plaintiff's fifth visit. A.R. 690.

disturbance of emotions and conduct. A.R. 680. She assigned a GAF score of 48. *Id.* On the day before, Dr. Gonzalez had assigned a GAF score of 60 during a session with Plaintiff. A.R. 692.

Massachusetts' Disability Determination Services performed a Mental Residual Functional Capacity Assessment on January 15, 2008. Ex. 14F, A.R. 586-89. The evaluator concluded, from the information available at that time, that although Plaintiffs' claims of depression had support in the clinical records, and although he demonstrated difficulty concentrating, being in large groups and dealing with increased stress, he appeared "able to understand, remember and carry out at the very least simple basic tasks," "able to maintain adequate concentration/pace to simple tasks for 2 hour intervals in an 8 hour day," "to have the capacity to relate adequately with others," and "able to adapt adequately to routine changes." A.R. 588.

At the hearing conducted by Administrative Law Judge Martha Bower (the "ALJ") in November of 2009 concerning Plaintiff's claim for disability, Dr. John Ruggiano, a psychiatrist, testified as a medical expert. Tr. of Oral Hearing Nov. 6, 2009, A.R. 51-63. Dr. Ruggiano noted that, despite Plaintiff's claims of mental illness, and the "severe pathology" described in the 2008 and 2009 consultative exam reports, he had not participated in consistent treatment for those issues until after the first

hearing before the ALJ in May of 2009.  A.R. 52-53, 63.  In
addition, although there had been mentions of auditory
hallucinations in consultations and at the first session with
Plaintiff's treating physician, Dr. Gonzalez, that issue did not
appear in subsequent session notes or any treatment records.
A.R. 52.

    2. <u>Physical Impairments</u>

    Plaintiff has a history of obesity and degenerative disease
of the lumbar spine. *See generally* Progress Notes, Dept.
Veterans Affs., Exs. F1-F3, A.R. 289-556.  His claimed physical
impairments also include hearing loss, penile cancer,
hypertension, sleep apnea, asthma, and headaches, but his appeal
does not address the ALJ's findings with respect to physical
ailments other than his lumbar condition. *See generally* Pl.'s
Br., Dkt. No. 10.

    Plaintiff's degenerative disease of the lumbar spine has
been documented through multiple diagnostic test results.  An MRI
in September 2003 revealed small posterior paracentral soft L2-L3
disc protrusion, prominent posterior L5-S1 disc bulge and
degenerative disc disease, and straightened lumbar curvature;
Plaintiff was diagnosed with lumbar spondylosis.  Physical
Medicine Rehab Attending Note, A.R. 386-87 (Apr. 8, 2004).  In
January 2004, an EMG revealed no evidence of L4-L5-S1
radiculopathy but did indicate left mid-lumbar L4-L5 increase

insertional activity.  Physical Medicine Rehab Diagnostic Study
Report, A.R. 412 (Jan. 29, 2004).  In February 2004, an x-ray
showed straightening of the cervical spine and degenerative
changes at C5-C6.  Radiology Report, A.R. 547 (Feb. 2, 2004).  In
June of 2004, a CT scan of Plaintiff's lumbar spine revealed
degenerative disc disease at L4-5 and L5-S1 and right-sided
spondylolysis at L4 without significant spondylolisthesis.
Radiology Report, A.R. 543 (June 21, 2004).

     In December 2007, Plaintiff underwent a medical consultative
examination performed by Dr. Simon Tenenbaum.  Ex. 8F, A.R. 563-
69.  At that consultation, Plaintiff complained of low back pain
and a neck ache that radiated to the head and caused daily
headaches.  A.R. 563  At the time, Plaintiff was 5'5" and weighed
235 pounds.  *Id.*  In the examination, Dr. Tenenbaum noted that
Plaintiff could not turn his head to the right or left beyond 75
degrees and was not able to bend at the waist beyond 80 degrees.
A.R. 564.  In addition, Plaintiff's sensation was decreased on
the left side in the "distal region."  *Id.*  An x-ray of the spine
indicated narrowing of the L4 transitional vertebra interspace.
A.R. 567-68.

     In 2008, Plaintiff became a patient of Greater New Bedford
Community Health, and he was seen by Ann L. Leal, GNP, on May 6,
2008.  Ex. 16F, A.R 604-10.  She examined him and noted that he
weighed 247 pounds.  A.R. 606.  At that time, Plaintiff reported

back pain with left lower extremity parathesis. *Id.* Nurse Leal recommended that Plaintiff lose wight. *Id.* In October 2008, Plaintiff saw Nurse Leal again and reported intermittent back pain that improved as he got up and moved around in the mornings. Progress Note, Ex. 21 F, A.R. 626 (Oct. 17, 2008). At that time, Nurse Leal also noted that Plaintiff worked intermittently. *Id.*

Dr. Parakrama Ananta examined Plaintiff in January of 2009. Initial Outpatient Evaluation Note, Ex. 20F, A.R. 620-21. Plaintiff complained of low back pain without significant radiating symptoms, though he did report that he had discomfort in the back and on the left side radiating into the buttock. A.R. 620. The physical evaluation revealed a moderate amount of lumbar paraspinal spasm, limited range of motion, straight leg raising to 90 degrees bilaterally, motor examination of grade 5 strength in bilateral lower extremities, and no significant sensory deficits. *Id.* Dr. Ananta diagnosed Plaintiff with degenerative joint disease and mechanical low back pain and recommended that he be started in a pool therapy program. A.R. 621.

### B. Procedural History

On October 19, 2007, Plaintiff filed applications for SSDI and SSI, claiming disability since July 9, 2004. Application Summary for Supplemental Security Income, Ex. 1D, A.R. 165-71; Application Summary for Disability Insurance Benefits, Ex. 2D,

8

A.R. 172-79.  The claims were both denied at the initial level of review on January 18, 2008, Disability Determination and Transmittal, Exs. 1A & 2A, A.R. 86-87, and subsequently by the Federal Reviewing Official on May 29, 2008.  Office of Federal Reviewing Official, Notice of Unfavorable Decision, Ex. 3A, A.R. 88-93.  Plaintiff filed a written request for a hearing on June 19, 2008.  Ex. 6B, A.R. 105-106.

An initial hearing was held before the ALJ on May 28, 2009, and a second hearing was held on November 6, 2009.  Decision in the Case of Jose R. Serpa Velasquez, Office of Diability Adjudication and Review (Nov. 23, 2009) (Bower, ALJ) [hereinafter "ALJ Decision"].  At the hearings, the ALJ accepted testimony from the Plaintiff, as well as a medical expert and a vocational expert.  *Id.*  On November 23, 2009, she issued her decision concluding that Plaintiff had not been disabled from July 9, 2004 through the date of the decision under the meaning of the Social Security Act.  *Id*.

The ALJ determined that Plaintiff suffered from the following severe impairments:  degenerative joint disease of the spine, hearing loss, obesity, penile cancer as of December 2008, and a post traumatic stress disorder.  *Id.* at 4.  Notwithstanding these findings, the ALJ concluded that Plaintiff had the "residual functional capacity to perform less than the full range of light work," as defined by regulation.  *Id.* at 5.  In

particular, she found that:

> [Plaintiff] can lift and/or carry up to 10 pounds
> frequently and 20 pounds occasionally, as well as sit
> for at least 6 hours, and stand or walk for 6 hours in
> an 8 hour workday.  The claimant may only occasionally
> climb, balance, kneel, stoop, crouch, and crawl.  He
> may perform occasional bilateral overhead reaching.
> The claimant must avoid concentrated exposure to loud
> noise.  He has a moderate limitation in concentration,
> persistence and pace, such that he can understand,
> remember and carry out simple 1-2-3 step tasks not
> involving independent judgment.  The claimant also has
> a moderate limitation in social interactions, requiring
> an object oriented task with only occasional work
> related interactions with supervisors, co-workers, and
> the general public.

*Id.*  The ALJ further concluded that, although Plaintiff could not

perform past relevant work, "there are jobs that exist in

significant numbers in the national economy that" Plaintiff can

perform.  *Id.* at 11.  The Decision Review Board selected

Plaintiff's claim for review but did not complete its review

within 90 days; consequently at that point the ALJ's decision

became final.  Notice of Decision Review Board Action, A.R. 1-3

(Mar. 8, 2010).

Plaintiff filed a timely complaint appealing the final

decision of the Social Security Administration on May 5, 2010.

Dkt. No. 1.  Following the filing of the administrative record,

the Plaintiff moved to reverse the decision, or in the

alternative, remand for further hearing.  Dkt. No. 9.  Defendant

thereafter moved for an order affirming the decision.  Dkt. No.

11.

II. LEGAL FRAMEWORK

**A.  *Standard for Entitlement to SSDI and SSI Benefits***

The issue on appeal is whether the Plaintiff is "disabled" for purposes of the Social Security Act and is therefore eligible for SSDI and SSI benefits.  A "disability" is defined as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period" of at least twelve months.  42 U.S.C. § 423(d)(2)(A) (providing the definition with respect to SSDI); 42 U.S.C. § 1381c(a)(3)(A) (same with respect to SSI).  An individual may only be considered "under a disability" for purposes of receiving benefits if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1381c(a)(3)(B).

The Commissioner has adopted a five-step analysis for determining whether an individual is disabled.  20 C.F.R. §§ 404.1520(a), 416.920(a).  The determination of disability may be made at any point in the sequential evaluation process; that is, if the Social Security Administration can determine that an individual is or is not disabled at a step, the decision is made

and it is not necessary to move to subsequent steps. *Id.* §§
404.1520(a)(4); 416.920(a)(4).

Under the first step, if the individual is engaged in
"substantial gainful activity," he or she is not disabled. *Id.*
The second and third steps consider the severity of the alleged
impairment. Under the second step, if the Plaintiff does "not
have a severe medically determinable physical or mental
impairment that meets the duration requirement . . . or a
combination of impairments that is severe and meets the duration
requirement" the individual is not disabled. *Id.* Under the
third step, if an impairment meets or is equal to an impairment
specifically listed in the regulations and meets the durational
requirement, the individual is deemed disabled. *Id.*

At the fourth step, the claimant's residual functional
capacity is determined, and if, given this determination, the
claimant is capable of performing his or her past relevant work,
he or she is not disabled. *Id.* The fifth step considers the
residual functional capacity as well as age, education and work
experience to determine whether the claimant can make an
adjustment to other work; if an adjustment can be made the
individual is not disabled, and if an adjustment cannot be made,
the individual is disabled. *Id.* If an applicant shows that he
or she is unable to perform past relevant work under step four of
the analysis, the Commissioner must come forward with evidence of

the existence of specific jobs in the national economy that the applicant would be able to perform.  *See Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001).

## B.  *Standard of Review of ALJ's Decision*

Judicial review of social security disability determinations is authorized by the Social Security Act, 42 U.S.C. § 405(g), which provides this court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  The factual findings of the Commissioner must be treated as conclusive if "supported by substantial evidence." *Id.*  Review is "limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *see also Seavey*, 276 F.3d at 9.

Substantial evidence exists where, "'a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *see also Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998) ("Substantial evidence . . . means evidence reasonably sufficient

to support a conclusion."). In contrast, the court is not bound
by factual findings that are "derived by ignoring evidence,
misapplying law, or judging matters entrusted to experts."
*Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## III. ANALYSIS

Plaintiff challenges the ALJ's findings with respect to the
severity of his physical and mental impairments. He appears to
argue, first, that his mental impairment meets the criteria of
listing 12.06 of Appendix 1 to Subpart P of the Social Security
Regulations at 20 C.F.R. Part 404, and therefore qualify him as
disabled under step three of the five-step analysis. He also
argues that the ALJ improperly discounted the severity of both
his mental health impairment and his lumbar condition in arriving
at her assessment of residual functional capacity.

### A. Assessment of Mental Impairment

In the third step of her analysis, the ALJ considered
several listings of impairments set out in the Social Security
Administration's regulations to determine whether Plaintiff's
impairments met or were equal to those described conditions. ALJ
Decision at 4-5. The listings she examined included one mental
health listing, at 12.06, which describes anxiety related
disorders. *Id.* In order to meet the required level of severity
of listing 12.06, a claimant must experience the signs and
symptoms in paragraph A as well as the functional impairments

14

described in either paragraph B or C.  20 C.F.R. Pt. 404, Subpt.

P, Appx. 1, Listing 12.06.  The ALJ did not address whether the

claimant displayed the signs or symptoms in paragraph A, and so

for purposes of my analysis I will assume that she found that

Plaintiff satisfied that component of the listing.

The ALJ analyzed Plaintiff's impairment under paragraph B.[3]

ALJ Decision at 5.  Paragraph B provides that a qualifying

disorder must result in at least two of the following conditions:

(1) "Marked restriction of activities of daily living;" (2)

"Marked difficulties in maintaining social functioning;" (3)

"Marked difficulties in maintaining concentration, persistence,

or pace;" or (4) "Repeated episodes of decompensation, each of

extended duration."  The ALJ observed that "marked" means more

than moderate but less than extreme on the scale for evaluating

mental impairments.  *Id.* at 4; *see* 20 C.F.R. Pt. 404 Subpt. P,

Appx. 1, Listing 12.00(C).  "Episodes of decompensation" are

defined as "exacerbations or temporary increases in symptoms or

signs accompanied by a loss of adaptive functioning, as

manifested by difficulties in performing activities of daily

living, maintaining social relationships, or maintaining

concentration, persistence, or pace."  *Id.* 12.00(C)(4).  As the

---

[3] The ALJ summarily concluded that paragraph C, which
describes a disorder "[r]esulting in complete inability to
function independently outside the area of one's home," does not
apply to Plaintiff.  ALJ Decision at 5.  Plaintiff does not
dispute that this provision is inapplicable to his impairment.

ALJ noted, the phrase "repeated episodes of decompensation, each of extended duration" is defined as three episodes in one year, or an average of one over four months, each lasting at least two weeks. *Id.*; ALJ Decision at 4.

For purposes of both evaluating Plaintiff's impairments in light of listing 12.06 and determining his residual functional capacity, the ALJ concluded that Plaintiff had the following limitations as a result of his mental impairments: "mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation." ALJ Decision at 5.

The ALJ concluded that Plaintiff's treatment history and activities of daily living contradicted his assertions regarding the limitation caused by his mental impairments. The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his symptoms, including his symptoms related to the mental impairment, "not credible." *Id.* at 6.

It is appropriate for the ALJ to make a determination of a claimant's credibility in light of the treatment history, daily activities, and medical opinions provided. *See* SSR 96-7p, 1996 WL 374186, at *1-2 (July 2, 1996) ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record. . . . The determination or

decision must contain specific reasons for the finding on
credibility . . . .").

In reaching her conclusion that Plaintiff's claims lacked
credibility, the ALJ observed that Plaintiff did not participate
in consistent treatment for his claimed mental health problems
until June 2009, after the initial hearing, and was not on mental
health medication from July 2005 to June 2009. *Id.* at 9. She
also noted that he testified to using public transportation and
working part time from February to November 2008 as a janitor in
a movie theater. *Id.* During the time period for which he
claimed disability, Plaintiff also reported that he handled his
personal care, cleaned, shopped, handled finances, read, watched
television, played dominos, talked to his parents, sister and
occasionally his children, wrote his thoughts down, listened to
the radio, and sometimes went out with his parents. *Id.* (citing
Exs. 9E, 22F). In addition to his work at the movie theater in
2008, he also worked there part time in 2007 and was a part time
security guard in 2007. *Id.* at 10 (citing Exs. 6D, 8D, 9D, and
10D). The ALJ concluded that these factors indicated Plaintiff's
"symptoms are not as severe as alleged." *Id.*

The ALJ also relied on the treatment records of Dr.
Gonzalez, which "consistently noted" that Plaintiff had only
"moderate limitations in his daily activities;" the Disability
Determination Services psychological consultant's evaluation; and

the testimony of Dr. Ruggiano. *Id*. She gave these pieces of
evidence "significant probative weight," or alternatively stated,
"substantial probative value," because they were generally
consistent with the record as a whole. *Id.* at 10-11; *see* 20
C.F.R. §§ 404.1527(d), (f) (setting out criteria for weighing
medical opinions).

Plaintiff argues that his testimony with respect to his
mental impairment is corroborated by the consultative
examinations by Drs. Heskett, Estes, and Stelle, and that the
reliance on Dr. Gonzalez's treatment notes and the testimony of
the medical expert was misplaced. He points out that Dr.
Gonzalez's assessments were not supported by explanatory notes,
unlike those produced in the three consultative examinations, and
that Dr. Ruggiano's expert testimony should be disregarded
because he could not rebut the consultative exams and because he
exhibited bias towards Plaintiff.

The ALJ considered the consultative evaluations performed in
2007, 2008 and 2009 as well as Plaintiff's treatment history at
the VA. ALJ Decision at 8-9. It is the responsibility of the
ALJ "to determine issues of credibility and to draw inferences
from the record evidence," and to resolve "conflicts in the
evidence." *Irlanda Ortiz*, 955 F.2d at 769. There were several
conflicts in the evidence presented to the ALJ. For example, Dr.
Stelle's consultative examination on July 31, 2009, at which she

18

assigned a GAF of 48, Ex. 32F, A.R. 680, differed considerably from the assessment by Dr. Gonzalez from a session the day before, at which he assigned a GAF of 60. Progress Note, Ex. 34F, A.R. 692. The ALJ noted that Dr. Stelle's conclusion that Plaintiff would be a "poor occupational candidate at present," Consultative Examination Report, Ex. 32F, A.R. 680, is "not supported by and is not consistent with the record as a whole" and is therefore "not entitled to significant probative weight." ALJ Decision at 10.

Another conflict existed between Dr. Heskett's conclusions regarding the severity of Plaintiff's impairments and the fact that, at the time of the evaluation, Plaintiff was employed as a janitor. Finally, as noted, the Plaintiff's own statements contradicted his treatment history and his daily activities throughout the time period. I find that the ALJ's resolution of these conflicts and determinations with respect to Plaintiff's mental impairment are supported by substantial evidence. She adequately evaluated and weighed all of the evidence in arriving at her conclusion. In particular, she gave specific reasons for concluding that Plaintiff's assertions were not credible.[4]

---

[4] Plaintiff argues that Dr. Ruggiano exhibited "significant bias towards social security claimants," pointing to the following statement made at the hearing: "There is such a contrast that it makes me, if I needed to interpret it, I would say he's doing what most people do who apply for benefits, putting his worst foot forward." Tr. of Oral Hearing Nov. 6, 2009, A.R. 61. Plaintiff fails to demonstrate that the ALJ

## B. Assessment of Physical Impairment

With respect to the assessment of his physical impairments, Plaintiff argues that the ALJ "improperly discounted the severity of the lumbar condition," pointing to the diagnostic results of his x-rays, MRI, CT scan, and EMG. Plaintiff asserts that the residual functioning capacity for his degenerative disease of the spine should have been assessed as more restrictive.

The ALJ considered the diagnostic results cited by Plaintiff, as well as the examinations performed by Dr. Tenenbaum, Nurse Leal, and Dr. Anata. ALJ Decision at 6-7. The ALJ concluded that, as with the mental impairment, the record did not support Plaintiff's allegations of disability. *Id.* at 9. She noted that Plaintiff had apparently not followed the recommendations of Dr. Anata to participate in aqua or physical therapy, that he was not on pain medication nor had he received any physical therapy or injections for his lumbar pain during the relevant time period. *Id.* Despite repeated recommendations to lose weight, he had not done so in any significant amount. *Id.* In addition, the ALJ noted that, as with Plaintiff's mental impairment, his exertions in part-time work and recreational activities was inconsistent with the claimed limitations. *Id.* at

---

improperly relied on this portion of Dr. Ruggiano's testimony (or relied on it at all), or that the statement unduly influenced the outcome of the hearing. Consequently, I find no error in the use the ALJ actually made of Dr. Ruggiano's testimony.

9-10.  The ALJ noted a lack of evidence describing Plaintiff's physical limitations at the level claimed.  *Id.* at 10.  She found that the Disability Determination Services report concluding Plaintiff could perform light exertional work activity with occasional overhead reaching bilaterally was supported by and consistent with the record as a whole.  *Id.*[5]

Contrary to Plaintiff's assertions, the results of the x-rays, CT scan, MRI and EMG are not independently conclusive of the severity of Plaintiff's impairment.  Plaintiff offers no direct evidence supporting his claimed limitations.  I find that the ALJ considered the entire record, including the diagnostic results cited by Plaintiff in his brief, and that her conclusion with respect to the physical residual functional capacity is supported by substantial evidence.  Here again, she gave specific reasons for finding Plaintiff's assertions were not credible.

## IV. CONCLUSION

For the reasons explained herein, I conclude that the ALJ had substantial evidence to conclude that Plaintiff was not disabled.  I therefore GRANT Defendant's motion for an order

---

[5]  The ALJ, in fact, went beyond the Disability Determination Services assessment of physical residual functional capacity.  She notes that the assessment pre-dated the evaluation of Plaintiff's hearing and so did not include noise limitations which she independently incorporated in the residual functional capacity.  ALJ Decision at 10.  In addition, the ALJ found that Plaintiff had postural limitations beyond those found by DDS. *Id.*

affirming the decision of the Commissioner (Dkt. No. 11) and DENY

Plaintiff's motion for an order to reverse, or in the alternative

remand, the decision (Dkt. No. 9).


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE